# EXHIBIT 1

Received 9-28-06 MC

GAO
Accountability * Integrity * Reliability

United States Government Accountability Office
Washington, DC 20548

Comptroller General
of the United States

**DOCUMENT FOR PUBLIC RELEASE**
The decision issued on the date below was subject to a GAO Protective Order. This redacted version has been approved for public release.

# Decision

**Matter of:** Alion Science & Technology Corporation

**File:** B-297022.4; B-297022.5

**Date:** September 26, 2006

L. James D'Agostino, Esq., Richard L. Moorhouse, Esq., David T. Hickey, Esq., Hannah Brody, Esq., and Andrew J. Belofsky, Esq., Greenberg Traurig, LLP;
J. Scott Hommer III, Esq., Kier X. Bancroft, Esq., and Peter A. Riesen, Esq., Venable LLP, for the protester.
Thomas C. Papson, Esq., Jason N. Workmaster, Esq., and Kara M. Klaas, Esq., McKenna Long & Aldridge LLP, for Advanced Engineering & Sciences, a division of ITT Industries, Inc., an intervenor.
Flayo O. Kirk, Esq., Defense Information Systems Agency, for the agency.
Glenn G. Wolcott, Esq., Office of the General Counsel, GAO, participated in the preparation of the decision.

## DIGEST

Where agency previously failed to meaningfully consider potential conflicts of interest created by awardee's contract performance of electromagnetic spectrum engineering services that could affect awardee's other spectrum-related interests, agency's corrective actions adequately remedied the prior procurement flaws, where the agency performed and documented its review of the spectrum-related products and services produced or provided by the awardee and the awardee's competitors, identified the awardee's customers of spectrum-related products and services, considered the impact that performance of the contract requirements may have on awardee's spectrum-related interests, and reasonably concluded that awardee's plan to perform conflicted portions of the contract requirements through use of "firewalled" subcontractors will adequately avoid, neutralize, or mitigate the potential conflicts of interest with minimal impact on performance quality.

## DECISION

Alion Science & Technology Corporation protests various Defense Information Systems Agency (DISA) actions taken in connection with the award of a contract to Advanced Engineering & Sciences (AES), a division of ITT Industries, Inc. (ITT), pursuant to request for proposals (RFP) No. HC1047-05-R-4009 to provide

electromagnetic spectrum engineering services for DISA's Joint Spectrum Center (JSC).[1] Alion protests that the agency failed to reasonably consider the potential organizational conflicts of interest (OCI) created by ITT's performance of the contract requirements.

We deny the protest.

BACKGROUND

In February 2005, DISA issued RFP No. HC1047-05-R-4009, seeking proposals to "provide the JSC with Electromagnetic Spectrum Engineering (ESE) services to facilitate improved mission effectiveness." RFP at 4.[2] The solicitation laid out a comprehensive list of the various activities the contractor will be required to perform.[3] Offerors were advised that proposals would be evaluated on the basis of technical factors, past performance, and cost/price, and that award would be based on the proposal offering the "best overall value" to the government. RFP at 62.

In April 2005, proposals were submitted by three offerors, including Alion and ITT.[4] Thereafter, discussions were conducted, proposal revisions submitted, and final proposals evaluated. In July 2005, ITT's proposal was selected for award.

---

[1] Alion, or one of its predecessor entities, has been the incumbent contractor for the requirements at issue here for over 40 years.

[2] Since issuance of the solicitation, the JSC has been consolidated with DISA's Defense Spectrum Office and is now a "field office" within DISA's Defense Spectrum Organization. See www.disa.mil/main/prodsol/dso.html.

[3] The solicitation identified six task areas–"Operational Spectrum Support," "E3 [electromagnetic environmental effects] and Spectrum Engineering," "Modeling and Simulation," "Information Management," "Research and Evaluate Emerging Technologies," and "Technical Advice"–and listed particular activities the contractor will be expected to perform under each area. RFP at 4. The listed activities included "analyz[ing] incidents of electromagnetic interference (EMI), determine causes, and recommend methods of resolution," "coordinating electromagnetic compatibility (EMC) standards," "analyzing equipment and systems for potential E3 problems and recommending solutions," "assisting the acquisition community by assessing E3," "providing assistance in acquiring host nation approval for equipment operation," "determining electromagnetic spectrum implications and opportunities for exploitation by DOD [Department of Defense]," and "analyzing national and international electromagnetic spectrum issues and advising executive decisionmakers on the technical viability of policy and implementation options." Id.

[4] The third offeror's proposal was subsequently eliminated from consideration, is not relevant to Alion's protest, and is not further discussed in this decision.

In August 2005, Alion filed its first protest, challenging the award to ITT on various bases, including that the agency failed to reasonably consider the OCIs created by ITT's performance of the contract requirements. Thereafter, the agency advised this Office that it was taking corrective action, to include an amendment of the RFP's OCI provisions[5] and a request that offerors submit revised OCI plans. We dismissed Alion's August 2005 protest pending completion of the agency's corrective actions.

Thereafter, ITT and Alion submitted revised OCI plans,[6] and the agency performed an assessment regarding the potential for conflicts of interest to arise. With regard to contract performance by ITT, the agency concluded that there was a "maximum potential" for 15 percent of the contract requirements to create conflicts, but stated that it considered this estimate to be "high" and that actual OCIs were expected to be "significantly lower." Addendum to Source Selection Authority Decision, Sept. 22, 2005, at 2. Based on the agency's OCI assessment, and ITT's intent to rely on "firewalled" subcontractors for performance of the potentially conflicted portions of the contract requirements, the agency concluded that ITT's OCI plan was acceptable and, in September 2005, again selected ITT's proposal for award.[7]

In September 2005, Alion filed another protest challenging the agency's source selection decision, again asserting, among other things, that the agency's OCI assessment was flawed.

Our review of the procurement record, provided in response to Alion's September 2005 protest, established that the agency's OCI assessment failed to meaningfully consider the scope and extent of ITT's spectrum-related interests. Specifically, the agency's assessment failed to meaningfully address the fact that ITT, as well as ITT's competitors, manufacture and market multiple spectrum-dependent products, and that these products are sold to, and used by, multiple customers, including various departments within the U.S. government, foreign governments, and commercial customers worldwide. Additionally, the agency's assessment appeared to assume

---

[5] As ultimately amended, the RFP provided that offerors' proposals with regard to OCI issues would be assessed as acceptable or unacceptable pursuant to subpart 9.5 of the Federal Acquisition Regulation (FAR).

[6] ITT's plan identified various potential OCIs that could be encountered in performing the contract requirements and stated that, in instances where potential OCIs are identified, the conflicted requirements would be assigned to an ITT subcontractor and a "firewall" would be created between ITT and the subcontractor. ITT OCI Plan, Sept. 9, 2005, at 14.

[7] ITT's proposal was rated higher than Alion's proposal with regard to the technical evaluation factors and offered a slightly lower evaluated cost/price.

that only performance of acquisition-related activities under the contract would create potential OCIs--failing to recognize that OCIs are created any time contract performance involves a contractor's exercise of judgment with regard to matters that have the potential to affect other contractor-related interests. See FAR §§ 9.505, 9.508. In sum, the agency's OCI assessment failed to recognize that ITT's performance of various contract activities could significantly affect the spectrum-related interests of ITT, ITT's competitors, and ITT's customers. In January 2006, our Office issued a decision sustaining Alion's protest. Alion Sci. & Tech. Corp., B-297022.3, Jan. 9, 2006, 2006 CPD ¶ 2.

In our January 2006 decision, we recommended that the agency reconsider the extent and potential impact on contract performance resulting from ITT's spectrum-related interests. Specifically, we recommended that the agency fully identify ITT's involvement with spectrum-related products and services and similarly identify ITT's competitors and customers with spectrum-related interests. We further recommended that, upon identification of the spectrum-related interests of ITT, ITT's competitors, and ITT's customers, the agency reconsider the potential OCIs reasonably created by ITT's performance of the various contract requirements.[8] Finally, we recommended, upon consideration of the full extent of potential OCIs, that the agency also consider the impact that ITT's reliance on "firewalled" subcontractors would have on contract performance.

Following receipt of our January 2006 decision, the agency stated that it would implement our recommendations. In May 2006, the agency completed its report documenting the actions taken in response to our January 2006 decision. As discussed in more detail below, the agency's reconsideration of the factors creating potential OCIs for ITT resulted in the agency's recognition that ITT's performance of the contract requirements will create a higher level of potential OCIs than the agency had previously believed.[9] Nonetheless, after considering the impact that the higher

---

[8] As noted above, the solicitation specifically contemplates a wide range of activities that could affect various organizations' spectrum-related interests, including: providing policy advice to DOD on spectrum-related matters; analyzing specific equipment and systems for potential electromagnetic environmental effect problems and recommending solutions; analyzing specific instances of electromagnetic interference and recommending solutions; and providing assistance to DOD in acquiring host nation approval for operation of spectrum-related equipment. RFP at 4.

[9] As noted above, the agency initially concluded that significantly less than 15 percent of the total contract requirements would create potential OCIs for ITT. The agency has now concluded that nearly one-third of the contract requirements will create potential OCIs for ITT. Contracting Officer's (CO) Statement at 5, 15.

level of potential OCIs will have on contract performance, the agency again concluded that award to ITT will result in the best overall value to the government.

In June 2006, the agency notified Alion that ITT had again been selected for contract award. On June 20, Alion filed this protest challenging that selection. As discussed below, we deny the protest.

DISCUSSION

Alion's June 2006 protest references various portions of this Office's January 2006 decision, asserting generally that the agency failed to reasonably implement the recommendations contained therein. Alion Protest, June 20, 2006, at 3. More specifically, Alion maintains that the agency's reconsideration of ITT's potential OCIs is still unreasonably low, and that the agency has not reasonably considered the impact that ITT's use of "firewalled" subcontractors will have on contract performance. Id. at 4-5.[10] Alion requests that this Office recommend that DISA "declare ITT disqualified and ineligible to receive any award under the subject Solicitation," and that DISA "immediately reaward the JSC spectrum engineering services requirements to Alion." Id. at 8-9. We reject Alion's arguments and requests.

As noted above, in response to this Office's January 2006 decision, DISA performed and documented a review of the potential OCIs that ITT's performance of the contract requirements would create. Impaired Objectivity (IO) Organizational Conflict of Interest Assessment of ITT Industries, Inc., May 31, 2006. In connection with this review, the agency sought and received additional information from both ITT and Alion regarding their respective spectrum-related interests. Following receipt of the additional offeror-provided information, the agency conducted its own research and analysis regarding the scope of the offerors' spectrum-related interests[11] and, in the context of those interests, assessed the extent to which performance of the various contract requirements would create potential OCIs.

In assessing ITT's potential OCIs, the agency first identified ITT's various business groups, and the divisions within those groups, reviewing the types of products and services produced or provided by each group generally and, within the groups, the

---

[10] Alion asserts that "no amount of revisions to ITT's plan could successfully mitigate or neutralize [ITT's] pervasive OCI[s]." Protest at 6.

[11] In identifying the offerors' spectrum-related interests, the agency relied on a variety of information sources, including: the offerors' final revised OCI plans, ITT's annual reports, Securities and Exchange Commission (SEC) 10-K filings, marketing brochures, the offerors' internet sites, trade journals, and the subject matter expertise of JSC's engineering and project management staff. Id. at 3.

products and services of each division specifically.[12] With regard to the divisions that are involved with spectrum-related products or services, the agency further identified the specific products and services those divisions produce or provide.[13] Id. at 6-15. The agency also identified ITT's competitors,[14] as well as its worldwide customers and teaming partners,[15] in the various markets. Id. The agency's analysis also identified where ITT's various spectrum-related products and services are

---

[12] ITT is divided into several business groups. The agency determined that the business divisions involved with spectrum-dependent products and services are all within the Defense Electronics and Services group; these divisions include AES (the division that submitted the proposal here), the Aerospace/Communications division, the Electronics Systems division, the Space Systems division, and the Systems division. Id. at 6. The agency states that the Defense Electronics and Services group generated approximately $2.4 billion in revenues (35% of ITT's total revenues) in fiscal year 2004. Id. at 16.

[13] For example, products or services provided by ITT's AES division include "Missile Defense Research," "Remote Control Programs and Products," "Sensor Technology," Specific Emitter Identification Systems," "Electronic Warfare Support," "Air Traffic Controls Systems Engineering Services," "GPS Systems Engineering," "Microwave Systems," "Spectrum Engineering and Management," and "Telecommunication Acquisition Management Support." Id. at 6-7. Similarly, specific spectrum-related products produced by ITT's Aerospace/Communications division include single channel ground and airborne radio systems, tactical radio networks, voice data switches, fiber optics transmission systems, and secure communications terminals; this division is also involved in developing next generation wireless networking radios, including the Joint Tactical Radio System, and with producing precision military and commercial GPS receivers. Id. at 7-8. Products produced by other divisions within ITT's Defense Electronics and Services business group include electronic warfare products, advanced radar systems, payloads/components for GPS satellites, and ground-based jamming equipment. Id. at 8-10.

[14] The agency states that ITT's competitors with spectrum-related interests include, "General Dynamics, Lockheed-Martin, Northrop Grumman, Boeing, Raytheon, Honeywell, Computer Sciences Corporation, Science Applications International Corporation, Anteon, International Corporation, Alion Science and Technology, Booz, Allen, Hamilton, Inc., [and] CACI International, Inc.," along with "Astrium, Alcatel, [and] Ball Aerospace," as well as foreign competitors, including "Alenia Spazio, Alenia Marconi Systems, EADS, Ericsson, Hindustan Aeronautics, Indra Sistemas, NEC, Selex Sistemi, Telsa, Toshiba, and Thales." Id. at 8-10.

[15] Customers of ITT's divisions involved with spectrum-dependent products or services include commercial organizations worldwide, as well as the governments of "Brazil, UK, Sweden, Egypt, Singapore, South Korea, and 32 other countries." Id. at 9.

generally used or deployed. Id. at 11. Finally, the agency's analysis took into consideration the organizations and entities, including foreign governments, with which DOD competes for electromagnetic spectrum access. Id. at 15-19.

Upon completing its research regarding the scope of ITT's spectrum-related interests, the agency reconsidered the nature of the contract activities to be performed, as identified in the solicitation, focusing on the extent to which the anticipated activities could create OCIs for ITT. Id. at 20-26. In conjunction with the agency's review of the activities listed in the solicitation, the agency also performed a review of all JSC projects that were performed under Alion's incumbent contract during the immediately preceding fiscal year, making judgments as to the potential OCIs that such activities would create for ITT, and calculating the dollar value of such potentially conflicted work. Id. at 27-39. Finally, the agency considered the effect that ITT's reliance on "firewalled" subcontractors to perform potentially conflicted portions of the contract requirements would have on the quality of contract performance. Id. at 33-39.

Based on all of the above research and analysis, the agency concluded that the level of potential OCIs that ITT is likely to experience under the contract is, indeed, higher than what the agency had initially believed. As noted above, the agency now estimates that nearly one-third of the total contract effort could create OCIs for ITT.[16] CO Statement at 5, 15. Nonetheless, the agency concluded that the contract activities creating potential OCIs for ITT could be reasonably segregated, and adequately avoided, neutralized, or mitigated, through contract performance by "firewalled" subcontractors. Accordingly, the agency determined that ITT's proposal still offered the best overall value to the government.

Alion continues to assert, as it has in its various prior protest submissions, that the agency's OCI assessment is inaccurate or otherwise unreasonable. Based on our review of the current record, we do not agree.

Contracting officers are required to identify potential conflicts of interest as early in the acquisition process as possible, and to avoid, neutralize, or mitigate such conflicts to prevent the existence of conflicting roles that might impair a contractor's objectivity. In assessing potential OCIs, the FAR directs the contracting officer to examine each contracting situation individually on the basis of its particular facts and the nature of the proposed contract, and to exercise common sense, good judgment, and sound discretion with regard to whether a conflict exists and, if so,

---

[16] The agency's calculation with regard to the percentage of potential OCIs is based on the agency's review of every project completed under the incumbent contract during the preceding fiscal year, identification of those projects that would create potential OCIs for ITT, and calculation of the total dollars spent on such projects, as a percentage of the total contract dollars spent during the fiscal year.

the appropriate means for resolving it; the primary responsibility for determining whether a conflict is likely to arise, and the resulting appropriate action, rests with the contracting agency. FAR § 9.505; RMG Sys., Ltd., B-281006, Dec. 18, 1998, 98-2 CPD ¶ 153 at 4; Epoch Eng'g, Inc., B-276634, July 7, 1997, 97-2 CPD ¶ 72 at 5. Once an agency has given meaningful consideration to potential conflicts of interest, our Office will not sustain a protest challenging a determination in this area unless the determination is unreasonable or unsupported by the record. SRS Techs., B-258170.3, Feb. 21, 1995, 95-1 CPD ¶ 95 at 9.

Here, Alion's protest has not identified any material aspect of the agency's review and analysis that renders the agency's conclusions unreasonable. Specifically, Alion has not identified any material aspect of ITT's involvement in producing or providing spectrum-related products and services that the agency has overlooked or otherwise ignored. Based on the discussion above, we believe the agency has reasonably identified the scope and extent of ITT's involvement with spectrum-related products and services, as well as reasonably identified ITT's competitors and customers, including foreign governments, that possess spectrum-related interests.

Further, the agency's consideration of each particular contract activity listed in the solicitation, along with consideration of every contract project performed during the preceding fiscal year, appears to be thorough and complete. To the extent Alion has expressed disagreement with various agency judgments regarding the various solicitation activities and/or performance of particular past projects that could create OCIs for ITT, Alion's arguments fail to identify any material flaws that would render the agency's overall conclusions unreasonable. A protester's mere disagreement with an agency's judgment does not establish that the judgment was unreasonable. See, e.g., Hanford Envtl. Health Found., B-292858, B-292858.2, Apr. 7, 2004, 2004 CPD ¶ 164 at 4. On this record, we find no basis to question the reasonableness of the agency's conclusion regarding the portion of contract requirements that could create OCIs for ITT.[17]

---

[17] Alion makes much of the fact that, following submission of this protest and Alion's subsequent arguments regarding prior performance of particular projects, the agency increased its calculation of potential OCIs from 29 percent to 32 percent of the total contract effort. Alion Comments, Aug. 7, 2006, at 5-7. We do not view this adjustment in the agency's assessment as a basis for sustaining the protest. In this regard, we do not view an agency's projection of potential OCIs to be an exact science, nor do we expect that an OCI projection will be calculated to a mathematical certainty. Rather than requiring a precisely calculated forecast of future OCIs, FAR subpart 9.5 mandates that an agency reasonably and realistically recognize and consider the potential for OCIs. Here, the agency has met its obligation.

Alion next protests that the agency failed to meaningfully address the impact that ITT's reliance on "firewalled" subcontractors for performance of conflicted contract requirements would have on the quality of ITT's contract performance. We do not agree.

As noted above, in its actions responding to this Office's January 2006 decision, the agency specifically considered the effect that ITT's reliance on "firewalled" subcontractors would have on the quality of contract performance. Impaired Objectivity (IO) Organizational Conflict of Interest Assessment of ITT Industries, Inc., May 31, 2006, at 33-39. In performing its analysis of this issue, the agency first noted that, pursuant to the task ordering process to be used in performing this contract, separate task orders will be issued for activities where there are potential OCIs. Id. at 33-34. The agency noted that in ITT's September 2005 proposal and OCI plan, ITT specifically recognized that certain activities would create potential OCIs which would be performed by "firewalled" subcontractors, and that its proposal specifically contemplated that ITT's subcontractors would perform up to [deleted] percent of the total contract effort. Id. at 34. In reviewing this matter, the agency considered the projected breakout of work to be performed by the various subcontractors, concluding that "the overlapping of competencies between ITT and its firewalled subcontractors is sufficient to resolve all the cases of IO [impaired objectivity] OCI," and noting that "[e]ven in those functional task areas where the percentage of conflicted work is high, using firewalled subcontractors should be workable within the construct of the original ITT Technical Proposal." Id. at 34-35. The agency's report follows up this conclusion with a more detailed analysis addressing which of ITT's proposed subcontractors could perform conflicted work under each of the various task areas. Id. In concluding that the quality of contract performance would not be materially affected by the higher level of potential OCIs, the agency specifically considered various factors affecting quality, including subcontractor competence, cost, and timeliness. Based on its consideration of these issues, the agency concluded that "[t]he overall effect of segregating tasks and using firewalled subcontractors to perform them has minimal impact on cost, timeliness, and quality." Id. at 38.

Alion complains that the agency cannot, and should not, trust ITT to properly identify all OCIs during contract performance. Alion's protest on this issue suggests that ITT's input with regard to potential OCIs during contract performance will be dispositive. The record is to the contrary. Specifically, although the agency intends for ITT to be actively involved in identifying potential conflicts during contract performance, the record is clear that the agency will–and in our view, must–independently review each task order for potential OCIs on an ongoing basis.[18]

---

[18] In testifying before this Office during the hearing we conducted in connection with Alion's September 2005 protest, the contracting officer stated: "We will not rely on ITT's analysis alone. We will independently perform that analysis, and only after (continued...)

Here, based on the record as discussed above, the agency reasonably considered the impact on the quality of performance caused by ITT's reliance on "firewalled" subcontractors to perform conflicted contract requirements, concluding that the impact would be minimal. Although Alion disagrees with that judgment, it has not persuasively identified any material basis for concluding that the agency's judgment is unreasonable. In this regard, procuring agencies are generally in the best position to determine their actual requirements and the best method for meeting them. In reviewing protests challenging an agency's assessments with regard to a particular performance approach, our Office will not substitute our judgment for that of the agency; rather, we will review the record to determine whether the judgments are reasonable and consistent with the solicitation criteria. See, e.g., RMS Indus., B-247233, B-247234, May 1, 1992, 92-1 CPD ¶ 412. On this record, we find no basis to sustain Alion's protest challenging the reasonableness of the agency's consideration and analysis regarding the impact of ITT's reliance on "firewalled" subcontractors to perform conflicted requirements.

The protest is denied.[19]

Gary L. Kepplinger
General Counsel

---

(...continued)
we're satisfied that there are no OCI issues[,] or that – if an OCI issue is identified, that a proper mitigation strategy is incorporated in that task order when we issue the task order." Hearing Transcript, Dec. 1, 2005, at 26-27.

[19] In its various protest submissions, Alion made various additional allegations regarding the agency's selection of ITT, including the assertion that the agency's source selection authority and/or other agency personnel were biased against Alion due to Alion's long-time incumbency. We have reviewed the entire record, considering all of Alion's various allegations, and find no basis for sustaining the protest.