**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**BID PROTEST**

| | |
|---|---|
| ALION SCIENCE AND TECHNOLOGY CORPORATION,<br>Plaintiff, | |
| v. | No. ____________________ |
| THE UNITED STATES OF AMERICA,<br>Defendant. | **AGREED-UPON REDACTED COPY - MAY BE MADE PUBLIC** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Dated: September 29, 2006

VENABLE LLP

J. Scott Hommer, III
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1685
Telecopier No.: (703) 821-8949
Protected Telecopier No.: (703) 760-1644

*Counsel for Alion Science and Technology Corporation*

Of Counsel:

L. James D'Agostino
Richard L. Moorhouse
Andrew Belofsky
Greenberg Traurig, LLP
1750 Tysons Blvd., Suite 1200
McLean, Virginia 22102
Telephone No.: (703) 749-1300
Telecopier No.: (703) 749-1301

Peter A. Riesen
Keir X. Bancroft
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 821-8949

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ........ 1
II. QUESTIONS PRESENTED ........ 2
A. Whether DISA's Award of the JSC Contract to ITT Should Be Put Aside Because of the Impaired Objectivity OCIs Inherent in Awarding the JSC Contract to ITT ........ 2
B. Whether The GAO's Decision Upholding DISA's Latest Evaluation of ITT's Impaired Objectivity OCIs and ITT's So-Called OCI Mitigation Plan Was Unreasonable and Inconsistent With Prior GAO Pronouncements ........ 2
III. STATEMENT OF THE CASE ........ 2
A. The Parties ........ 2
B. The Procurement For Joint Spectrum Center Electronic Spectrum Engineering Services ........ 2
C. Alion's Initial Protest Before The GAO ........ 4
D. The Agency's Subsequent Evaluation Of Revised OCI Mitigation Plans ........ 6
E. Alion's Subsequent Protest Before The GAO ........ 7
IV. JURISDICTION AND STANDARD OF REVIEW ........ 8
A. Jurisdiction and Standing ........ 8
B. Standard Of Review In The Post-Award Bid Protest Context ........ 9
C. Standard For Preliminary Injunctive Relief ........ 10
V. ARGUMENT ........ 11
A. Alion Has A Substantial Likelihood of Success On The Merits Because DISA's Award Decision Was Arbitrary, Capricious, And An Abuse Of Discretion ........ 11
1. ITT Should Have Been Disqualified In Accordance With The FAR ........ 11
2. ITT's Conflicts Are Too Numerous and Pervasive For Its Scheme To Use "Firewalled" Subcontractors To Have Any Efficacy ........ 13
3. DISA Ignored The Fact That ITT's OCIs Have A Substantial Effect On The Scoring Of DISA's Evaluation of ITT's Technical Proposal ........ 20
4. DISA Failed To Reevaluate ITT's Price With Regards To Cost Savings ........ 26
5. DISA Ignored ITT's Conflicts And Neglected To Reevaluate ITT's Price And Technical Proposals Because It Was Predisposed To Award ITT The Contract In Order To Break The So-Called "Stranglehold" of Alion ........ 28
6. The GAO's Decision Is Unreasonable And Inconsistent With Prior GAO Pronouncements ........ 30
B. Alion Will Suffer Irreparable Harm If ITT Is Allowed To Commence Performance Of The Awarded Contract ........ 34
C. The Harm To Alion Outweighs Any Potential Harm To The Defendant ........ 36
D. Granting Injunctive Relief Is Strongly In The Public Interest ........ 37
VI. CONCLUSION ........ 38

## EXHIBITS

A. Modification No. P00210 of Contract No. DCA100-00-C-1012
B. Excerpts from RFP No. HC1047-05-R-4009
C. Impaired Objectivity (IO) Organizational Conflict of Interest Assessment of ITT Industries, Inc.
D. ITT Revised OCI Mitigation Plan
E. June 8, 2006 E-Mail from [redacted]
F. Third Declaration of Richard H. Meidenbauer
G. Excerpts From Protester's July 17, 2006 Response to Request From GAO
H. Excerpts From Protester's Comments on Agency Report in B-207022.4, .5
I. Declaration of Joseph Yavorsky
J. Excerpts From ITT Technical Proposal
K. Excerpts From Contracting Officer's Statement of Relevant Facts
L. DISA's Memorandum for the Record
M. Excerpts From May 11, 2006 JSC Revised OCI Assessment
N. Affidavit of Richard H. Meidenbauer

# TABLE OF AUTHORITIES

## Cases

*Advanced Data Concepts, Inc. v. United States*, 43 Fed. Cl. 410, 416 (1999)........................ 9, 10
*Aero Corp., S.A. v. United States*, 38 Fed. Cl. 237, 242 (1997) ................................................ 38
*Aetna Government Health Plans, Inc.; Foundation Health Federal Services, Inc.*, B-254397.15 *et al*., July 27, 1995, 95-2 CPD ¶ 129......................................................................... 1, 31
*Alion Sci. & Tech. Corp.*, B-297022.3, Jan. 9, 2006, 2006 CPD ¶ 2 ...................................passim
*Alion Sci. & Tech. Corp.*, B-297022.4 and .5, Sept. 26, 2006......................................1, 8, 13, 30
*Burroughs Corp. v. United States*, 223 Ct. Cl. 53, 63 (1980) ...................................................... 9
*CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 580 (2004)......................................... 38
*Dairy Maid Dairy, Inc. v. United States*, 837 F. Supp. 1370, 1377 (E.D. Va. 1993)................. 10
*E.W. Bliss Co. v. United States*, 33 Fed. Cl. 123, 135 (1995) ...................................................... 9
*Filtration Development Co, LLC v. United States*, 63 Fed. Cl. 612, 623 (2005) .................. 29, 37
*FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) ................................................ 11
*Font v. United States*, 219 Ct. Cl. 335, 593 F.2d 388 (1979)...................................................... 9
*Gentex Corp. v. United States*, 58 Fed. Cl. 634, 654 (2003)...................................................... 36
*J & H Reinforcing and Structural Erectors v. United States*, 50 Fed. Cl. 570, 577 (2001)......... 34
*Jade Trading, LLC v. United States*, 65 Fed. Cl. 487 (1999)..................................................... 38
*Lion Raisins, Inc. v. United States*, 52 Fed. Cl. 115, at 119 (2002)........................................... 34
*Lockheed Martin Aeronautics Co., et al.*, B-295401, *et al.*, Feb. 24, 2005, 2005 CPF ¶ 41 ......... 7
*Magnavox Electronic Sys. Co. v. United States*, 26 Cl. Ct. 1373, 1379 (1992) .......................... 34
*Minor Metals, Inc. v. United States*, 38 Fed. Cl. 16, 19 (1997)........................................... 10, 37
*MTB Group v. United States*, 65 Fed. Cl. 516, 524 (2005)......................................................... 9
*MVM, Inc. v. United States*, 46 Fed. Cl. 137, 142 (1999) ................................................... 11, 34
*Overstreet Elec. Co. Inc. v. United States*, 59 Fed. Cl. 99, 107 (2003) ................................. 9, 35
*Parcel 49C Limited Partnership v. United States*, 31 F.3d 1147, 1154 (Fed. Cir. 1994)............ 36
*PGBA, LLC v. United States*, 57 Fed. Cl. 655, 664 (2003)........................................................ 34
*PURVIS Sys. In.*, B-293807.3, Aug. 16, 2004 CPD ¶ 177 ................................................. 20, 32
*Research Analysis & Maintenance, Inc.; Westar Aerospace & Defense Group, Inc.*, B-292587.4, *et al.*, Nov. 17, 2003 ..................................................................................................20, 23, 31
*Science Applications Int'l Corp.*, B-293601 *et al.*, May 3, 2004, 2004 CPD ¶ 96............... 13, 32
*Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000)...................................... 35
*Sierra Military Health Care v. United States*, 58 Fed. Cl. 573, 585 (2003) ............................... 38
*Stratos Mobile Networks USA, LLC v. United States*, 44 Fed. Cl. 633, 641 (1999).................... 35
*TRW Envt'l. Safety Sys. v. United States*, 16 Cl. Ct. 520, 526 (1989) ................................ 10, 35
*Vehicular Techs. Corp. v. Titan Wheel Int'l*, 141 F.3d 1084, 1087-88 (Fed. Cir. 1998)............. 10
*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843-44 (D.C. Cir. 1977) ........................................................................................................................ 10
*Wetsel-Oviatt Lumber Co. v. Untied States*, 43 Fed. Cl. 748, 753 (1999) ................................. 34

**Statutes**

10 U.S.C. § 2305 .......... 30
28 U.S.C. § 1491(b) .......... 8
5 U.S.C. § 706 (2006) .......... 9
*Hawpe Constr., Inc. v. United States*, 10 Fed. Appx. 958 (Fed. Cir. 2001) .......... 8

**Regulations**

FAR 1.602-2 .......... 12
FAR 15.3 .......... 30
FAR 15.506(b)-(d) .......... 29
FAR 3.101-1 .......... 12
FAR 9.504(e) .......... 12
FAR 9.505-3 .......... 1

**Treatises**

11A Wright & Miller § 2948.3 .......... 11

Plaintiff Alion Science and Technology ("Alion"), by its undersigned counsel, submits this Memorandum of Law in Support of Its Motion For Preliminary Injunction. Alion seeks an immediate injunction to enjoin an award by the Defense Information Systems Agency ("DISA" or "Agency"), for services solicited under Solicitation Number HC1047-05-R-4009, in support of the Joint Spectrum Center ("JSC Contract"). In doing so, Alion requests that this Court enjoin the Agency from following the recommendations of the Government Accountability Office ("GAO") in its decision in *Alion Sci. & Tech. Corp.*, B-297022.4 and .5, Sept. 26, 2006 ("*Alion II*"), denying Alion's protest of the subject award.

## I. PRELIMINARY STATEMENT

This case is before the Court because the Agency seeks to jeopardize the safety of our Nation's warfighters and incur additional, unnecessary costs by turning a blind eye to the impaired objectivity Organizational Conflicts of Interest ("OCIs") of ITT Industries, Inc. ("ITT") because of an Agency-perceived "stranglehold" on the JSC contract by the incumbent competitor, Alion.

This case concerns DISA's failure to properly evaluate the extent of ITT's impaired objectivity OCIs in the context of this Contract. There are three types of OCIs: unequal access to information, biased ground rules, and impaired objectivity. *Aetna Government Health Plans, Inc.; Foundation Health Federal Services, Inc.*, B-254397.15 *et al.*, July 27, 1995, 95-2 CPD ¶ 129 at 13. Pursuant to FAR 9.505-3, an impaired objectivity OCI will arise where a firm's work under one Government contract requires it to evaluate itself or its competitors, either through an assessment of performance under another contract or an evaluation of proposals. In these "impaired objectivity" cases, the concern is that the firm's ability to render impartial advice to the Government could appear to be undermined by its relationship with the entity whose work product is being evaluated. *Id.* As will be discussed in more detail below, throughout the history

of this procurement, DISA has shown itself to be incapable of adequately identifying impaired objectivity OCIs, or determining what constitutes effective mitigation of such conflicts.

## II. QUESTIONS PRESENTED

### A. Whether DISA's Award of the JSC Contract to ITT Should Be Put Aside Because of the Impaired Objectivity OCIs Inherent in Awarding the JSC Contract to ITT

### B. Whether The GAO's Decision Upholding DISA's Latest Evaluation of ITT's Impaired Objectivity OCIs and ITT's So-Called OCI Mitigation Plan Was Unreasonable and Inconsistent With Prior GAO Pronouncements

## III. STATEMENT OF THE CASE

### A. The Parties

1. Plaintiff Alion Science and Technology Corporation is an employee-owned technology solutions company that delivers technical expertise and operational support to the Department of Defense, civilian Government agencies and commercial customers. Alion is the incumbent on DISA's JSC Contract, which has been extended through December 31, 2006. *See* Modification No. P00210, Ex. A. Along with its predecessor, the IIT Research Institute ("IITRI"), Alion has performed on the JSC Contract for nearly 40 years.

2. Defendant is the United States acting through the Defense Information Systems Agency on behalf of the Department of Defense's ("DoD's") Joint Spectrum Center ("JSC").

### B. The Procurement For Joint Spectrum Center Electronic Spectrum Engineering Services

3. This procurement has endured a long and arduous life. It began in February 2005, when DISA issued RFP No. HC1047-05-R-4009, seeking proposals to provide the Agency's Joint Spectrum Center ("JSC") "with Electromagnetic Spectrum Engineering ("ESE") services to facilitate improved mission effectiveness." RFP at 4, Ex. B.

4. The solicitation contemplated the award of an Indefinite Delivery Indefinite Quantity ("IDIQ") task order type contract, and it set forth six task areas to be performed under the contract, including Operational Spectrum Support; E3 (Electromagnetic Environmental Effects) and Spectrum Engineering; Modeling and Simulation; Information Management; Research and Evaluate Emerging Technologies; and Technical Advice. *Id.*

5. Activities to be performed under each area included: analyzing incidents of electromagnetic interference ("EMI"), determining causes, and recommending methods of resolution; coordinating electromagnetic compatibility ("EMC") standards; analyzing equipment and systems for potential E3 problems and recommending solutions; assisting the acquisition community by assessing E3; providing assistance in acquiring host nation approval for equipment operation; determining electromagnetic spectrum implications and opportunities for exploitation by the Department of Defense; and analyzing national and international electromagnetic spectrum issues and advising executive decision makers on the technical viability of policy and implementation options. *Id.*

6. The Scope of the RFP set forth that "[s]ervices are provided to the JSC in support of the Warfighter, Federal and non-Federal agencies, allied Governments, NATO, and the private sector." *Id.* (emphasis added).

7. The RFP set forth that proposals would be evaluated on the basis of technical factors, past performance, and cost/price; the award would be based on the proposal offering the best overall value to the Government. *Id.* at 62.

8. Under the technical factor, the RFP established four subfactors: technical approach, management plan, transition plan, and organizational strategic quality assurance plan. Under the subfactor for technical approach, the RFP established evaluation elements that

corresponded to each of the task areas of contract performance. Under the subfactor for management plan, the RFP initially established several evaluation elements, which included "Organizational Conflict of Interest Plan," calling for evaluation of "the offeror's plan to manage potential conflicts of interest." *Id.* at 64-66, Ex. B; s*ee Alion I* at 3.

9. Three offerors submitted proposals in response to the RFP in April 2005, including Alion and ITT Industries, Inc. ("ITT").[1] Discussions were conducted, proposal submissions were submitted, and final proposals were then evaluated. DISA selected ITT's proposal for award in July 2005. *Id.*

**C. Alion's Initial Protest Before The GAO**

10. In August 2005, Alion protested the award before the Government Accountability Office ("GAO") on the basis that the Agency failed to reasonably consider the Organizational Conflicts of Interest ("OCIs") created by ITT's performance of the contracts. The protest was dismissed after the Agency informed the GAO that it was taking corrective action. In actuality, the corrective action served to water down the extent to which DISA would need to be concerned with OCIs by deleting the OCI Plan evaluation subfactor, thereby defaulting to assessing OCI issues only under the "go/no-go" basis established in FAR 9.5. *Alion I* at 4. After the protest was dismissed, the Agency requested that Alion and ITT submit revised OCI Mitigation Plans ("OCI plans").

11. In its first OCI plan, ITT claimed to have identified potential OCIs that could be encountered in performing the contract requirements. ITT stated that in instances where potential

---

[1] The third offeror's proposal was eliminated from further consideration based on DISA's evaluation of initial proposals. *Alion I* at 3 n.5.

OCIs were identified, the conflicted work would be blindly assigned to an ITT subcontractor and a so-called "firewall" would be created between ITT and the subcontractor. *Alion I* at 5.

12. The Agency assessed Alion and ITT's OCI plans. With regard to contract performance by ITT, the Agency concluded that there was a "maximum potential" for 15 percent of the contract requirements to create conflicts, but stated that it considered this estimate to be "high" and that actual OCIs were expected to be significantly lower. *See Alion I* at 5. The Agency concluded that ITT's OCI plan was acceptable based on its assessment and ITT's stated intent to rely on firewalled subcontractor to perform potentially conflicted portions of the contract requirements. Thereafter, the Agency informed Alion that it was confirming its original award decision to ITT. *Id.*

13. In September 2005 Alion filed another protest with the GAO, challenging DISA's source selection decision on several grounds, including that the Agency conducted a flawed OCI assessment. In a decision issued on January 9, 2006, the GAO agreed with Alion, holding that DISA failed to meaningfully address the fact that ITT, as well as ITT's competitors, manufacture and market multiple spectrum-dependent products, and that these products are sold to, and used by, multiple customers, including various departments within the U.S. Government, foreign Governments, and commercial customers worldwide. *Alion Sci. & Tech. Corp.*, B-297022.3, Jan. 9, 2006, 2006 CPD ¶ 2 ("*Alion I*"). Further, the Agency's assessment was based on the assumption that only performance of acquisition-related activities under the contract would create potential OCIs. As the GAO held, DISA had failed to recognize that OCIs are created any time contract performance involves a contractor's exercise of judgment with regard to matters that have the potential to affect other contractor-related interests. *Id.* at 11.



**AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC**

14. The GAO recommended that DISA reconsider the extent and potential impact of ITT's OCIs on its spectrum-related interests, specifying that the Agency fully identify ITT's involvement with spectrum-related products and services and similarly identify ITT's competitors and customers with spectrum-related interests. *Id.* at 12. Further, the GAO recommended that, upon identification of the spectrum-related interests of ITT, its competitors, and its customers, that the Agency reconsider the potential OCIs reasonably created by ITT's performance of the various contract requirements. GAO also recommended that DISA consider the impact that ITT's reliance on firewalled subcontractors would have. *Id.*

**D. The Agency's Subsequent Evaluation Of Revised OCI Mitigation Plans**

15. Following the GAO's recommendations, DISA requested that Alion and ITT submit re-revised OCI plans.

16. Upon reviewing the re-revised OCI plans, DISA determined that ITT's performance of the contract will create a higher level of potential OCIs than it had earlier concluded. *See* Impaired Objectivity (IO) Organizational Conflict of Interest Assessment of ITT Industries, Inc. May 31, 2006 ("DISA ITT OCI Assessment"), Ex. C. In fact, the Agency determined that ITT's performance of the contract would result in 29 percent of the contract work being conflicted – nearly double the "maximum" 15 percent that the Agency concluded would be conflicted in its earlier evaluation. Nevertheless, DISA still concluded that despite the impact that the higher level of potential OCIs would have on contract performance, an award to ITT would result in the best overall value to the Government.

17. DISA reviewed ITT's revised OCI mitigation plan. After researching the scope of ITT's spectrum-related interests, DISA purports to have reconsidered the nature of the contract activities to be performed under the solicitation, stating that its focus was on the extent to which



AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC

the anticipated activities could create OCIs for ITT. DISA also reviewed JSC projects that were performed under Alion's incumbent contract, but it limited its review to only those performed on the incumbent contract during the preceding fiscal year. In doing so, DISA made judgments as to the potential OCIs that the activities would create for ITT and calculated the dollar value of the potentially conflicted work. DISA ITT OCI Assessment at ii, Ex. C.

18. DISA also claims to have considered all the effects that ITT's reliance on blind subcontractors to perform potentially conflicted portions of the contract requirements would have. As it had proposed in its September 2005 revised OCI mitigation plan, ITT indicated that [redacted] Even in that plan, ITT recognized that up [redacted] of the total contract effort would be performed by firewalled subcontractors. ITT Revised OCI Mitigation Plan, Ex. D.

19. In making the determination that ITT's revised OCI plan was sufficient to mitigate conflicts, [redacted], the source selection authority, communicated to other agency personnel that "I am uncomfortable with the extent of [ITT's] conflicts" but that "this will break Alion's stranglehold." June 8, 2006 E-Mail from [redacted], Ex. E. Neither the FAR nor the ground rules established in the RFP for this procurement allow an agency to rely on such a predisposition against an incumbent to outweigh concern with OCIs and, perhaps more importantly, as a basis for a source selection decision. *See Lockheed Martin Aeronautics Co., et al.*, B-295401, *et al.*, Feb. 24, 2005, 2005 CPF ¶ 41.

**E. Alion's Subsequent Protest Before The GAO**

21. In June 2006, DISA notified Alion that ITT had again been selected for contract award. On June 20, 2006, Alion filed a protest with the GAO challenging DISA's selection of ITT. Among its grounds of protest, Alion explained that the Agency's source selection was



AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC

unreasonable because the Agency again failed to adequately analyze ITT's OCIs, and it neglected to consider how blindly farming out such a significant amount of work to firewalled subcontractors necessarily changed the scores on ITT's proposal.

22. On September 26, 2006, the GAO issued a decision denying Alion's protest. *Alion II* at 8.

## IV. JURISDICTION AND STANDARD OF REVIEW

### A. Jurisdiction and Standing

This Court maintains jurisdiction and venue over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(b), which provides for "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." Further, [t]o afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." *Id.*

Alion has standing to bring this action because it is prejudiced by DISA's award of the Contract to ITT. ITT should have been disqualified, and Alion was the only other offeror. Alternatively, had DISA re-evaluated ITT's proposal in light of the impact of its massive firewalling, ITT's technical scores would have decreased and its cost evaluation would have increased, thereby necessitating award to Alion as the best value to the Government. Either way, there was a substantial chance that Alion would have received the contract award in the absence of DISA's error. *See Hawpe Constr., Inc. v. United States*, 10 Fed. Appx. 958 (Fed. Cir. 2001) (holding that to prevail on an action in the Court of Federal Claims, a party is required to show

that significant error occurred and that that error was prejudicial, and that to be considered a significant error, the Government's actions during the procurement process must not evince "rational reasoning and consideration of relevant factors.").

**B. Standard Of Review In The Post-Award Bid Protest Context**

The Administrative Procedure Act, 5 U.S.C. § 706 (2006), governs the United States Court of Federal Claims in the post-award bid protest context. *See, e.g., Advanced Data Concepts, Inc. v. United States*, 43 Fed. Cl. 410, 416 (1999) (*citing* 28 U.S.C. § 1491(b)). This means that the Court will set aside an agency procurement decision when it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "To prevail under the arbitrary and capricious standard in bid protest cases, a frustrated bidder must establish that the Government officials involved in the procurement process lacked a rational and reasonable basis for their decision." *Overstreet Elec. Co. Inc. v. United States*, 59 Fed. Cl. 99, 107 (2003). DISA lacked a rational and reasonable basis for deciding to award the Contract to ITT due to the Agency's failure to adhere to FAR provisions regarding mitigation of OCIs.

In cases in which the GAO has rendered a decision, "while the Court of Federal Claims affords deference to a GAO decision and does not conduct review *de novo*, the court's charge is to determine, based on the record before the contracting officer, whether an agency's procurement decision was reasonable." *MTB Group v. United States*, 65 Fed. Cl. 516, 524 (2005) (*citing E.W. Bliss Co. v. United States*, 33 Fed. Cl. 123, 135 (1995), *aff'd*, 77 F.3d 445 (Fed. Cir. 1996)). Therefore, the Court "is not bound by the views of the Comptroller General nor do they operate as a legal or judicial determination of the rights of the parties." *Burroughs Corp. v. United States*, 223 Ct. Cl. 53, 63 (1980) (*citing Font v. United States*, 219 Ct. Cl. 335, 593 F.2d 388 (1979)).



AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC

This comports with the well-established general proposition that an agency decision will be overturned if it is determined "(1) that the decision of the procurement official had no rational basis, or (2) that the decision involved a clear and prejudicial violation . . . ." *SDS Int'l, Inc. v. United States*, 55 Fed. Cl. 363, 365 (2003) (*citing Dairy Maid Dairy, Inc. v. United States*, 837 F. Supp. 1370, 1377 (E.D. Va. 1993)). The Court "may award any relief that [it] considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491 (b)(2)." *Advanced Data Concepts, Inc. v. United States*, 43 Fed. Cl. 410, 416 (1999).

**C. Standard For Preliminary Injunctive Relief**

In determining whether to grant the preliminary injunctive relief requested by Alion, this Court must balance the following four factors: (1) the likelihood that Alion will prevail on the merits; (2) the extent to which Alion will suffer irreparable injury if the Defendant is not enjoined from having ITT continue with performance on the Contract; (3) the extent to which harm to Alion outweighs the injury to the Defendant or other interested parties; and (4) the public interest in the requested relief. *See, e.g., Vehicular Techs. Corp. v. Titan Wheel Int'l*, 141 F.3d 1084, 1087-88 (Fed. Cir. 1998); *Minor Metals, Inc. v. United States*, 38 Fed. Cl. 16, 19 (1997).

This test is not "wooden" and does not require a finding that "ultimate success by the movant is a mathematical probability . . . ." *TRW Envt'l. Safety Sys. v. United States*, 16 Cl. Ct. 520, 526 (1989) (*citing Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843-44 (D.C. Cir. 1977)). The Court of Appeals for the Federal Circuit has recognized that "[n]o one factor . . . is necessarily dispositive," so that "the weakness of the showing regarding one factor . . . can be overborne by the strength of the others." *FMC Corp. v. United*

*States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *MVM, Inc. v. United States*, 46 Fed. Cl. 137, 142 (1999) ("Plaintiff does not need to establish all factors to entitle it to an injunction.").

Alion satisfies each of the elements required for the issuance of an injunction. Therefore, the United States should be enjoined from allowing ITT to perform the Contract, pending this Court's resolution of the issues raised in this Protest.

## V. ARGUMENT

### A. Alion Has A Substantial Likelihood of Success On The Merits Because DISA's Award Decision Was Arbitrary, Capricious, And An Abuse Of Discretion

To justify a preliminary injunction, a Plaintiff must generally show a "reasonable probability" of success on the merits. 11A Wright & Miller § 2948.3; *A.L.K. Corp. v. Columbia Pictures Indus., Inc.*, 440 F.2d 761, 763 (3d Cir. 1971); *King v. Saddleback Junior Coll. Dist.*, 425 F.2d 426, 428 n.2 (9th Cir. 1970); *cert. denied*, 404 U.S. 979 (1971). The degree of likelihood of success considered by itself is not determinative, but instead is weighed against the other factors. *OAO Corp. v. United States*, 49 Fed. Cl. 478, 481 (2001). To prevail on the merits of this bid protest action, Alion must show "a significant prejudicial error in the procurement process." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999).[2]

In the instant case, DISA made just such a prejudicial error, which warrants the disqualification of ITT from the procurement and the award of the Contract to Alion.

#### 1. ITT Should Have Been Disqualified In Accordance With The FAR

The FAR establishes that "The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships." FAR

[2] For the reasons that support substantial likelihood of success on the merits, Alion maintains that it also satisfies the more stringent requirement of demonstrating actual success on the merits necessary to secure a permanent injunction.



AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC

3.101-1. This obligation is borne primarily by Contracting Officers, who "are responsible for ensuring performance of all necessary actions for effective contracting, ensuring compliance with the terms of the contract, and safeguarding the interests of the United States in its contractual relationships." FAR 1.602-2. In awarding contracts, the discretion normally vested in Contracting Officers is curtailed where "a conflict of interest is determined to exist that cannot be avoided or mitigated." FAR 9.504(e).

ITT claims and DISA has accepted – unreasonably – that all OCIs will be mitigated by firewalling subcontractors. However as stated *infra*, neither ITT nor DISA have an understanding as to the extent of OCI-impacted work under the Contract. Furthermore, neither ITT nor DISA can forecast whether OCIs will increase due to the task order nature of the Contract work. This Court is no doubt well-aware that DISA awarded this Contract to ITT against the backdrop of tremendous consolidation in the marketplace, as well as increased outsourcing. Indeed, just ten years ago it would have been rare, if not nonexistent, to find a hardware manufacturer such as ITT venturing into an engineering services procurement like this. DISA should have been aware of this tremendous consolidation in the marketplace, and the resulting conflicts that could arise in a contract of this nature. As important, if not more, no amount of revisions to ITT's OCI Plan could successfully mitigate or neutralize ITT's extensive and pervasive OCIs. Because ITT cannot adequately mitigate the extensive amount of OCIs inherent in this Contract, ITT should be disqualified from the competition and the Contract should be awarded to Alion.



**AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC**

**2. ITT's Conflicts Are Too Numerous and Pervasive For Its Scheme To Use "Firewalled" Subcontractors To Have Any Efficacy**

The Court is presented with a case of first impression. Never before has an agency determined that conflicts of interest as pervasive as ITT's conflicts on this Contract could be mitigated by delegating work to so-called "firewalled" subcontractors. In past cases, the GAO has held that firewalled subcontractors are an adequate means of mitigation when OCIs are de minimis. *See, e.g., Science Applications Int'l Corp.*, B-293601 *et al.*, May 3, 2004, 2004 CPD ¶ 96 ("*SAIC I*"). However, by the admission of ITT and the Agency – which continue to underestimate the amount of conflicted work in this Contract – 32 percent, or about one third of the work on this Contract is conflicted and therefore must be issued to so-called "firewalled" subcontractors. *See Alion II* at 8 n.17. Clearly, one third of the tasking on a contract is much greater than a mere de minimis amount. The efficacy of ITT's proposed mitigation strategy has never been tested before. Given the risk inherent in operating multiple spectrum-dependent products in an already crowded electronic battlefield, it is inappropriate and perilous for the Agency to use this Contract, which governs use of the electromagnetic spectrum on the battlefield, as a means for test-driving ITT's proposed scheme.

**a) <u>The accuracy of DISA's assessment of the number and effect of ITT's OCIs is belied by the Agency's ever-changing conclusions as to the percentage of conflicted tasks under the JSC Contract</u>**

Since the new JSC Contract was first solicited in 2005, DISA has had many opportunities to evaluate potential conflicts of interest that would arise if ITT were to win award of the JSC Contract. At every turn, DISA has either overlooked or ignored many of ITT's OCIs. As a result, the Agency has been required to re-evaluate ITT's conflicts, and every time it has acknowledged the existence of an increasing number of conflicts. The increasing scale on which

DISA appears to be moving calls into question the accuracy of its OCI assessments, including its most recent assessment. In contrast, Alion has consistently identified the amount of work that would be conflicted if ITT were to be awarded the JSC Contract. Even when Alion adopted DISA's methodology during its most recent protest, *i.e.*, evaluating conflicts solely based on tasks performed on the JSC Contract during FY 2005, the results of Alion's analysis were consistent with its earlier findings: nearly half of the tasks that ITT would perform under the JSC Contract would be conflicted. Third Declaration of Richard H. Meidenbauer ¶ 6, Ex.

In one of its earlier assessments of ITT's OCIs, DISA concluded that only 15 percent of work on the JSC Contract would present conflicts for ITT. *See Alion I* at 5 ("Based on this assessment, the agency concluded that 'the maximum potential for impaired objectivity OCI occurrences is 15% of the total ESE contract projects.'") Indeed, the GAO noted that DISA considered that 15 percent number to be elevated. "The source selection authority elaborated on this projection, stating: 'The Government considers this [15%] estimate to be high and that the actual number of specific tasks posing potential OCI will be significantly lower.'" *Id.* n.9.

In its most recent OCI reassessment on May 31, 2006, DISA concluded that 29 percent of the work on the JSC Contract would be conflicted if ITT were to win the award – an amount of conflicted work nearly double the agency's initial assessment. DISA ITT OCI Assess., Ex. C.

Alion responded to the OCI reassessment when it submitted a more definite statement to the GAO on July 17, 2006. From a redacted version of the OCI reassessment and a review of the 450-page worksheet backup used by the Agency, Alion personnel concluded that at least eight additional major projects – none of which were cited by ITT or the Agency - posed potential conflicts for ITT. This raised the percentage of conflicted work to 40.5 percent. Upon reviewing



**AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC**

Alion's analysis, DISA conceded that at least two of those projects were indeed conflicted. Protester's July 17, 2006 Response to GAO Request, Ex. G.

In its August 7, 2006 Comments on the Agency Report, Alion identified even more tasks that posed potential conflicts for ITT, the impact of which served to increase the percentage of conflicted work on the JSC contract beyond 40.5 percent. *See* Excerpts from Comments on Agency Report at 11-12. All told, Alion concluded that more than $17 million worth of FY 2005 project plan dollars would be conflicted if performed by ITT – which is nearly 48 percent of FY 2005 project revenue. Third Declaration of Richard H. Meidenbauer ¶ 6, Ex. F. Though adhering to DISA's restrictive reassessment methodology during its subsequent protest, Alion's conclusions as to the percentage of conflicted work are consistent with its conclusions in the earlier protest.

**b) <u>The Agency and ITT continue to ignore or otherwise fail to identify Impaired Objectivity OCIs</u>**

As noted above, DISA was presented multiple opportunities to evaluate ITT's conflicts during the course of this procurement and protests, and each time showed its analysis to be inaccurate. The Agency's failure is mirrored by ITT's own inaccurate characterization of which JSC Contract tasks are or are not conflicted. Now, more than a year after ITT submitted its first OCI mitigation plan, it is evident that ITT and DISA continue to ignore, or otherwise fail to identify conflicts presented by JSC Contract work.

A prime example of this failure is evident in ITT's revised OCI mitigation plan and DISA's evaluation of the same. The Agency and the vendor had much different views of what work was conflicted under the JSC Contract. For example, DISA identified more than 40 projects with conflicts that ITT did not. *Compare* ITT Revised OCI Mitigation Plan and DISA Evaluation of



AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC

ITT Revised OCI Mitigation Plan. This casts obvious doubt on either the ability or willingness of ITT to monitor and identify potential conflicts as they arise during contract performance. Additionally, ITT has identified programs with conflicts not identified by DISA. *See Alion I* at 8. And, given DISA's ever-increasing determination of conflicted work under the JSC Contract, it is questionable whether the Agency would be as quick to acknowledge the existence of ITT's conflicts but for the increased attention Alion's protest actions have brought to this procurement.

Further, it is vital for the Court to understand that DISA's OCI reassessment was constrained to a review of the projects and tasks actually performed by Alion during FY 2005. *See* Third Declaration of Richard H. Meidenbauer (Meidenbauer Decl.) ¶ 4. This post hoc task order review accomplished little more than identifying what tasks would have posed conflicts for ITT had it been performing the JSC Contract in FY 2005. Moving forward, there is no way to determine what tasks may or may not present conflicts to ITT due to task order-oriented nature of this Contract. This greatly increases the risk of ITT performing a conflicted task, which in turn increases potential jeopardy for the warfighter.

**c) The Agency's failure to properly identify and address conflicts presents potential jeopardy to the warfighter**

This particular case illustrates the danger inherent in failing to identify potential impaired objectivity OCIs, or in failing to adequately mitigate those conflicts. In a declaration submitted with Alion's Comments on the Agency Report in Protest No. B-297022.4, Joseph S. Yavorsky, former Commander of the Agency here, the Joint Spectrum Center, illustrated the consequences of failing to identify or mitigate OCIs under the JSC Contract.

As the DoD's recognized center of technical expertise on spectrum and E3 matters, "the JSC is counted upon to provide unbiased participation in numerous standard and policy



AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC

formulating working groups and decision making bodies. . . ." Yavorsky Decl. ¶ 10, Ex. I. That unbiased participation is often provided by JSC contractors. *Id.* "I would be most seriously concerned if one of the JSC prime contractors would favor any particular industry player who may be impacted by the standard or policy being considered or formulated. . . Even if the participant was firewalled, the suspicion would always remain, thus impacting the great reputation of the JSC and thus potentially causing customers to refrain from using the JSC as their source for unbiased analysis." *Id.* Mr. Yavorsky goes on to state that "[t]his hesitation to use the services of JSC would . . . negatively impact its ability to perform one of its primary DoD missions of collecting EMC data (most of which comes from those very same customers)." *Id.*

As a result of this data scarcity, Mr. Yavorsky explains, "*the reduction of data in the archives of the JSC would very much impact the comprehensiveness of any electromagnetic battlespace analysis, which is crucial for support of the warfighter.*" Yavorsky Decl. ¶ 10, Ex. I (emphasis added). More specifically, Mr. Yavorksy states that:

> The key to JSC success is producing unbiased reports of what the EM operational facts are and allowing the warfighter to decide whether or not the risks can be mitigated in his/her operational environment. In a highly competitive environment, a contractor involved in this analysis, who may be beholden to an industry participant, may emphasize one particular test parameter over another, to introduce either positive or negative bias in the results. A situation like this could potentially affect multi-millions of dollars of defense procurement at a minimum, and may or may not be discovered in time to affect mitigation of a poor Government buy decision. *At worst, a situation like this could result in the warfighter receiving imprecise data which could affect his decisions causing more aggressive or more conservative use of his RF equipment either of which would be negative to the military operation.*

Yavorsky Decl. ¶ 11, Ex. I (emphasis added).

Mr. Yavorsky sets forth the known dangers and risks of allowing conflicts to go unidentified and unmitigated. However, that is within the context of this one contract. It is

simply unknowable what other types of conflicts might arise for a hardware manufacturer such as ITT during the course of the JSC Contract, or indeed in other DISA contracts for that matter. This much we know, if conflicts as pervasive and ineffectively mitigated as ITT's are permitted in other contracts, FAR 9.5 will be rendered merely academic and contract work that was previously regarded as conflicted will be in open season for vendors like ITT. As a result, the warfighter will be exposed to a new, and yet unknown, degree of risk.

**d) <u>Conflicted tasks on the JSC Contract are not easily segregable</u>**

As a preliminary matter, ITT's conflicts spring from the extent of JSC's role in the military system acquisition process, which involves JSC in virtually every spectrum-dependent system issued by DoD. Defense electronics alone constitute an annual market of $20 billion. ITT's involvement in the market has been set forth in its own disclosures and other public information. *See* Presentation Before the FBR 2006 Washington Conference, Wed. Mar. 1, 2006 (available at http://www.itt.com/ir/fbr06_pres.asp). Further, ITT's interests extend to agencies outside of DoD, including NASA and the FAA, and foreign interests. *Id.*

The tasks under the JSC Contract are not readily segregated, and thus not amenable to parsing out to firewalled subcontractors. As the GAO itself noted in *Alion I*, "because of the interrelated nature of the activities involved, they do not appear, on this record, to reasonably lend themselves to segregation for performance by ITT's 'firewalled' team members." *Alion I* at 11.

For example, as set forth in the analysis accompanying the Third Declaration of Richard H. Meidenbauer, Ex. F, the JSIR database task (valued by DISA at $100,000) is integral to Task 4 and cannot be segregated without compromising the efficiency of the Task. In another example, the Specials IA project, "Alion performs a substantial amount of electromagnetic environment definitions and analyses associated with the ground segments of certain space-based

communications systems. These analyses look at the impact of ITT-manufactured equipment on situations of interest to the customer. Isolated one-on-one analyses where it can be determined *a priori* that there is no ITT or competitor equipment involved is rare. The interrelated nature of this task and the coherence of this specially cleared project team precludes project segmentation." *Id.*

The former JSC Commander sets forth that the interwoven nature of the tasks under the JSC Contract help ensure the safety of the warfighter.

> As warfighting platforms become much more sophisticated and wireless, more incidents of electromagnetic fratricide are occurring and are being identified either as frequency interference and/or electromagnetic effects. Disciples of both disciplines are increasingly cooperating in solving issues. It is absolutely imperative that the various programs and pieces for the JSC contract be shared between each other. Segmenting core aspects of the contract via "firewalls" can be absolutely detrimental to the warfighter – making it extremely difficult to design, build, integrate, and operate sophisticated systems in the complex electromagnetic battle space.

Yavorsky Decl. ¶ 13, Ex. I. Further the former JSC Commander details the risk of trying to parse the interrelated tasks under the JSC Contract.

> It is critical to be able to predict, as much as possible, operational effects. For instance, numerous pieces of electronic equipment from various vendors reside in any combat operations center, be it airborne, ship borne, or on the ground and each has serious potential interference issues. To parse an interference analysis out to various subcontractors within the JSC to evaluate, firewalled from each other and the prime, would effectively pass the burden of any real-time integrated analysis to the soldier in the field who has other pressing issues.

*Id.* Essentially, "breaking up the JSC contract into various components to be performed by firewalled subcontractors without prime contractor oversight because of OCI issues could be similar to building a house without a general contractor – the plumbers, carpenters, electricians, masons, etc. would all start building to the specifications and drawings – but without anyone in



AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC

charge. Firewalling those technicians from each other in that construction endeavor would be a recipe for disaster." Yavorsky Decl. ¶ 8.

**3. DISA Ignored The Fact That ITT's OCIs Have A Substantial Effect On The Scoring Of DISA's Evaluation of ITT's Technical Proposal**

It was unreasonable for DISA to neglect to reevaluate ITT's proposal in light of the assertions made in its re-revised OCI mitigation plan. Significant elements of ITT's proposal underpinning its evaluation scores, such as its [redacted] have been so warped by its latest mitigation plan that DISA should have reevaluated ITT's proposal in order to make a proper determination of award. *Research Analysis & Maintenance, Inc.; Westar Aerospace & Defense Group, Inc.*, B-292587.4, *et al.*, Nov. 17, 2003 ("*RAM*"); *PURVIS Sys. Inc.*, B-293807.3, Aug. 16, 2004, 2004 CPD ¶ 177 at 7-8. This neglect on DISA's part has stymied the Government's objective of achieving best value under the Contract and will result in wasting millions of taxpayer dollars. Evidence of these actions are further discovered by reviewing ITT's capabilities pre-and post-mitigation plans to satisfy the Contract's requirements, as discussed below.

[redacted]

In its proposal, ITT makes much of the benefits of its [redacted] *See* ITT Technical Proposal at 91, Ex. J. ITT's [redacted] is less beneficial, however, in light of ITT's admission in its revised mitigation plan that more [redacted] of project work will be conflicted. *See* Revised OCI Mitigation Plan at 5-5. That is because ITT's revised mitigation plan calls for conflicted work to be performed by so-called "firewalled" subcontractors. "Where an impaired objectivity OCI arises that is significant, ITT will assign the conflicted work to a subcontractor and construct a firewall between ITT and that subcontractor. The firewall creates



AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC

[redacted] Revised OCI Mitigation Plan at 6-8. Further, "[t]he firewall [redacted]" *Id.*

In consideration of ITT's revised mitigation plan, it appears that ITT [redacted] The alleged strengths of ITT's [redacted] in its proposal are negated by firewalling work in which conflicts arise in an attempt to achieve OCI mitigation. When ITT submitted the proposal upon which its technical and cost evaluation scores are based, it improperly determined that very little contract work would be conflicted. Now, in its updated Plan, ITT acknowledges at [redacted] of the work will be conflicted, a percentage that is still much lower than the [redacted] that Alion demonstrates is actually conflicted. *See* Revised OCI Mitigation Plan. It is illogical and not possible for the Agency to maintain the scores it gives ITT for its [redacted] approach in light of the extensive firewalled subcontracting that ITT will need to achieve. Therefore, ITT's proposal should have been reevaluated in light of ITT's revised mitigation plan.

ITT claims that a benefit of its [redacted]" Technical Proposal at 103. This asserted benefit, however, is negated and contradicted by ITT's revised OCI mitigation plan.



**AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC**

As noted above, ITT's proposed firewall [redacted] Revised OCI Mitigation Plan 6-8. Because the firewall restrains ITT's contact with subcontractors performing conflicted work, it is [redacted] DISA's evaluation scoring has never taken this into consideration.

Further, ITT stated in its proposal that its [redacted] Revised OCI Mitigation Plan at 6-8. There is no such benefit to be had, however, in light of ITT's statement in its revised OCI mitigation plan that [redacted] Revised OCI Mitigation Plan 6-5. The [redacted] Again, DISA's evaluation scoring has never taken this into consideration.

Finally, ITT touted its [redacted] Technical Proposal at 100. However, a



AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC

firewalled subcontractor [redacted] subcontractors in order to comply with the restrictions of ITT's revised OCI mitigation plan. ITT's revised OCI mitigation plan therefore contradicts this asserted benefit of ITT's [redacted] Therefore [redacted]. DISA's evaluation has never taken this into consideration.

In light of the fact that ITT's revised mitigation plan impacts these significant elements of ITT's Proposal, the perceived benefits of ITT's proposed [redacted] to the JSC Contract are now negated due to its attempt to mitigate the amount of conflicted work, and ITT's evaluation scores should be downgraded accordingly. *See RAM*, B-292587.4, *et al.*, Nov. 17, 2003, (sustaining protest where the evaluation of a conflicted contractor's proposal was not downgraded given that the plan for mitigating that contractor's OCIs was to "have contract work performed by some other contractor or Government entity.").

[redacted]

Another benefit that ITT allegedly derives from its [redacted] Technical Proposal at 4. Further, ITT states that [redacted]



AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC

[redacted] Technical Proposal at 99. However, ITT's approach to [redacted] is negated by this assertion found in its Updated OCI Mitigation plan. [redacted] Revised OCI Mitigation Plan at 6-8. Further, [redacted] Revised OCI Mitigation Plan at 7-9.

The [redacted] that ITT promises in its proposal, as well as its [redacted] is lost when ITT [redacted] This [redacted] – and, in turn, [redacted] - is further driven home by the [redacted] Revised OCI Mitigation Plan at ES-5. The agency cannot be as assured of the [redacted] But again, DISA's evaluation scoring has never taken this into consideration.

[redacted]

ITT [redacted] In fact, in the beginning of its Past Performance Executive Summary, ITT states with pride: [redacted] Technical Proposal at 1. In a seemingly contradictory statement in its revised OCI Mitigation Plan, ITT asserts that [redacted] Revised OCI Mitigation Plan at ES-2.

In light of this type of back-tracking evident in ITT's Updated OCI Mitigation Plan, the agency should have reevaluated ITT's Proposal, at which time it would have been evident that Alion remains the best value for award of JSC's ESES Contract. Indeed, ITT's "Blue" past performance rating is now suspect because the prime and subcontractor roles have materially changed.[3] ITT's subcontractors will bear a third or more of the workshare on the JSC Contract. Thus, a significant amount of work performed on the Contract will be performed by firewalled subcontractors in lieu of ITT. DISA is thus not receiving ITT's experience, past performance,

[3] With regard to evaluation under the technical and past performance factors, the agency applied a color rating/narrative assessment evaluation system when it reviewed proposals. With regard to the past performance factor, blue indicated "highly relevant and very recent past performance in all identified past performance efforts; excellent performance ratings." *Alion I* at 4 n.6.



AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC

key personnel, and know-how, but that of various subcontractors. Therefore, ITT's rating should be reduced.

**4. DISA Failed To Reevaluate ITT's Price With Regards To Cost Savings**

ITT indicated in its proposal that its [redacted] would result in cost benefits to JSC. However, in light of the increased amount of conflicted work that even ITT acknowledges, and in consideration of certain aspects of ITT's revised mitigation plan, it is evident that such cost benefits are not to be had. Indeed, it was noted in the Contracting Officer's Statement in the Agency Report furnished during the GAO protest that OCI mitigation efforts will require the creation and execution of 21 additional task orders, at a cost increase of nearly 8 percent of the FY 2005 baseline. Excerpt from Statement of Relevant Facts at 11, Ex. K. DISA reported the FY 2005 baseline as $37,673,834. Excerpt from Memorandum for the Record at 2, Ex. L. Therefore, the cost impact of OCI mitigation, therefore, is nearly $3 million. Oddly, in a May 11, 2006 briefing entitled "JSC Revised OCI Assessment," one slide indicated the cost of OCI mitigation would have a "Minimal impact." Ex. M. As Alion pointed out to the GAO in its recent protest, there is no information or details provided in the slide, nor any rationale given as to why the impacts of OCI mitigation on cost, schedule or quality were deemed minimal, or even what the term "minimal" means. Ex. M.

It would appear that the Agency regards [redacted] as more than minimal in other contexts, such as when it was selecting ITT over Alion. The Contracting Officer's June 16, 2006 written debriefing, Protest, Exhibit A, restates DISA's 2005 determination that Alion's evaluated cost is [redacted] higher than ITT's in the first year. That determination is obviously negated when the Agency will incur nearly [redacted] in additional costs to mitigate ITT's OCIs arising under the Contract. Furthermore, this cost impact suffers from DISA and ITT's enlarging scale



AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC

of OCI impacted work under the Contract. Using the consistent percentage of conflicted work as demonstrated by Alion, the Agency would actually incur approximately $12 million in additional costs to mitigate ITT's OCIs under the Contract. *See* Third Declaration of Meidenbauer, Ex. F.

In the [redacted] ITT states that [redacted] Technical Proposal at 85. However, as noted above, ITT proposes to be cut off from firewalled subcontractors that perform conflicted tasks. In that event, ITT [redacted] Revised OCI Mitigation Plan at 6-8. Any cost benefit that might be derived from ITT's [redacted] Further, cost benefits to JSC are greatly reduced, if not eliminated altogether, by ITT's assumption that [redacted]

ITT refers to [redacted]

[redacted] Technical Proposal at 95. However, as stated in the revised OCI mitigation plan, under ITT's firewall arrangement, [redacted] Revised OCI Mitigation Plan, at ES-5. Thus, [redacted] will not exist for conflicted work. This presents another offset to ITT's purported cost benefits.

In conclusion, it is evident that ITT's OCIs have a substantial effect on the scoring of DISA's evaluation of ITT's technical proposal. DISA was unreasonable in neglecting to reevaluate ITT's proposal in light of the assertions made in its revised OCI mitigation plan.

**5. DISA Ignored ITT's Conflicts And Neglected To Reevaluate ITT's Price And Technical Proposals Because It Was Predisposed To Award ITT The Contract In Order To Break The So-Called "Stranglehold" of Alion**

According to [redacted]

On the [redacted] new source selection decision, [redacted] that the 29 percent conflict figure "gives me pause." However, [redacted] concluded that the Agency could "move forward with confidence" because of the use of firewalled subcontractors and the "awareness we now have of the issue . . ." Then, inexplicably [redacted] concluded by stating that the "JSC assessment results cite the stranglehold that Alion has had on JSC for decades as a serious deficiency. Breaking this is a good thing. . . ." June 8, 2006 E-Mail from [redacted] Ex. E.

It is evident from the unsolicited statements of the source selection authority in this procurement that the Agency has been predisposed to awarding this Contract to ITT. Here, the



AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC

Agency's predisposition toward ITT is spurred by what it perceives is a "stranglehold that Alion has had on JSC for decades . . . ." *Id.*

Breaking Alion's "stranglehold" however, is not reflected in the Solicitation's evaluation factors for award, and breaking Alion's "stranglehold" was wholly unrelated to the issue of whether ITT's numerous conflicts, which gave [redacted] pause, were adequately mitigated. It was reason enough, apparently, for the Agency to "move forward with confidence." *Id.* But DISA made no inquiry into what effect ITT's reliance on it's firewalling scheme would have on the evaluation scoring of ITT's technical and cost proposals. Instead, the basis for DISA's confidence, apparently, was use of the pretextual word "firewall" and the promise that Alion's stranglehold would be broken. Indeed, in its zeal to re-select ITT, DISA also skipped over OCI regulatory requirements to obtain approval or other direction from the head of the contracting activity, and to resolve ITT's admitted conflicts consistent with such approval or direction. *See Filtration Development Co, LLC v. United States*, 63 Fed. Cl. 612, 623 (2005); s*ee also* FAR 15.506(b)-(d).

Elsewhere, Agency officials indicated that they were interested if the "29%" would be "Defensible" at GAO. Ex. L. This, too, indicates that the Agency was not interested in the sufficiency of ITT's OCI mitigation plan. In fact, even though FAR 15.308 requires that an agency document and preserve the record of its evaluation and source selection decision-making, and even though DISA anticipated that re-selection of ITT would generate another protest from Alion, DISA inexplicably destroyed all the drafts and supporting materials for its latest reassessment of ITT's OCI Plan. *See* Alion Supplemental Protest, dated July17, 2006, at 18-19, Ex. G. This record reflects that DISA's reasons for awarding to ITT are not rooted in the Solicitation's evaluation criteria, and therefore DISA violated established procurement law and



**AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC**

regulation requiring agencies to follow the Solicitation evaluation factors for award by awarding based on a predisposition against the incumbent. *See* 10 U.S.C. § 2305; FAR 15.3.

**6. The GAO's Decision Is Unreasonable And Inconsistent With Prior GAO Pronouncements**

In *Alion II*, the GAO seemingly abandoned the core concerns it had identified up to and including the last decision on this same procurement. For example, in *Alion I*, the GAO plainly stated: "because of the interrelated nature of the activities involved, they do not appear, on this record, to reasonably lend themselves to segregation for performance by ITT's 'firewalled' team members." *Alion I* at 11. Such a conclusion – in addition to pointing out the realities of the contract requirements at issue – also points out an obvious oversight in the Agency's evaluation of ITT's weaknesses: on the one hand, in the original source selection decision, the Agency touted ITT's [redacted] while, on the other hand, the Agency has lately found ITT to be acceptable because of its extensive use of "segregated" and "firewalled" subcontractors. To clear up such an evaluation inconsistency, the Agency either would have had to disqualify ITT's [redacted] team because of potential OCIs or downgrade ITT's evaluation score because ITT's extensive system of firewalls would, by necessity, render it much less than [redacted]

Neither the Agency addressed this issue nor did the GAO in *Alion II*, despite the fact that the "activities involved" in the latter decision were precisely the same as they were in the first. In one particularly curious paragraph in *Alion II*, the GAO states, "the agency concluded that the level of potential OCIs that ITT is likely to experience under the contract is, indeed, higher than what the agency had initially believed. … Nonetheless, the agency concluded that the contract activities creating potential OCIs for ITT could be reasonably segregated, and adequately



AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC

avoided, neutralized, or mitigated, through contract performance by 'firewalled' subcontractors." *Alion II* at 7. At this point in the decision, the GAO should have reached the same conclusion as it reached previously: that such extensive (and byzantine) segregation may not be possible given, as *Alion I* observed, the "interrelated nature of the activities involved." This is apart from the fact that ITT's new network of firewalls significantly neutralizes ITT's previously perceived advantage in being an [redacted].

As noted above, in *Research Analysis & Maintenance, Inc.; Westar Aerospace & Defense Group, Inc.*, B-292587.4, *et al.*, November 17, 2003, the GAO sustained the protest where, in part, the evaluation of a conflicted contractor's proposal was not downgraded given that the plan for mitigating that contractor's OCIs was to "have contract work performed by some other contractor or Government entity." In contrast here, the GAO denied the protest without any consideration of the extent to which ITT's proposed solution is undermined by its plan to have contract work performed by other contractors and overseen by the Government.

Second, the GAO has previously held that "[t]here is a presumption of prejudice to competing offerors where an organizational conflict of interest (other than a *de minimis* matter) is not resolved." *Aetna Gov't Health Plans, Inc.*, B-254397 *et al.*, July 27, 1995, 1995-2 CPD ¶129. However, in *Alion II*, the GAO seems to have forgotten this standard altogether. *See SAIC I*.

In *Alion I* the GAO made much of the fact that "[t]he publicly available information we reviewed leaves no doubt that ITT has multiple financial interests with regard to manufacturing and marketing of spectrum-dependent products to the U.S. Government, to foreign Governments, and to commercial customers worldwide." *Alion I* at 6. The footnote that follows that sentence provides a detailed basis for such a conclusion:

> By way of example, ITT has stated that it provides single channel ground and airborne radios (SINCGAR), spectrum management systems, and several types of radar systems to DOD. Additionally, ITT states that: "ITT Industries is a global engineering and industrial manufacturing company with leading positions in the markets that it serves. The company is a major supplier of sophisticated military defense systems, and provides advanced technical and operational services to a broad range of Government agencies." *www.itt.com/downloads/defense12pg.pdf*. ITT elaborates that it has provided, or is providing, "Night vision equipment for Australian Defence Forces," "Imagers for Japanese weather satellites," "Airborne Self-Protection Jammers (ASPJ) for Republic of Korea," "Tactical communications systems for U.K. armed forces," and "Air traffic control radar systems for Brazilian Air Force." *Id.* ITT also states that it markets various spectrum-dependent products to commercial customers. *Id.*

*Id.*. Later in the opinion the GAO reiterates the same concern: "in light of the significant spectrum-related interests of ITT, ITT's competitors, and ITT's customers, that may well be affected by ITT's contract performance," the agency failed "to consider the scope and extent of such spectrum-related interests…." *Id.* at 11. This is in large part because, as part of its assessment, the GAO took seriously the long-standing rule that "potential impaired-objectivity OCIs are not limited to acquisition-related activities; rather, impaired-objectivity OCIs are created any time the performance of a contract requirement involves the contractor's exercise of judgment that could affect other contractor-related interests." *Id.* at 8 (*citing PURVIS Sys. Inc.*, B-293807.3, B-293807.4, Aug. 16, 2004, 2004 CPD ¶ 177, *Science Applications Int'l Corp.*, B-293601 *et al.*, May 3, 2004, 2004 CPD ¶ 96).

However, no similar concerns reflected in *Alion II* – despite the fact that the Agency has acknowledged even more OCIs than it previously admitted existed. In a footnote, the GAO in *Alion II* states that the Agency's original assessment put the number of potential OCIs at "significantly less than 15 percent of the total contract requirements." *Id.* The Agency's new

calculation, however, requires the Agency to admit "that nearly one-third of the contract requirements will create potential OCIs for ITT." *Id.* (citing CO Statement at 5, 15).

A separate footnote defends this significant increase in assessed potential OCIs by off-handedly stating that the GAO does "not view an agency's projection of potential OCIs to be an exact science, nor do we expect that an OCI projection will be calculated to a mathematical certainty." *Id.* This explanation misses the mark. Alion never demanded mathematical precision nor now requires it. Rather, per FAR subpart 9.5, Alion requested that the Agency merely "reasonably and realistically recognize and consider the potential for OCIs." *Id.* Nowhere in *Alion II* is there evidence that the Agency has engaged in that type of analysis.

Finally, *Alion II* never addresses how "firewalling" subcontractors would affect the proposal evaluation *under the terms of the Solicitation's Section M*. While the GAO does address the Agency's analysis of ITT's projected performance, that discussion focuses only on how those firewalls would affect "the quality of contract performance" in a general – and ultimately amorphous – sense, but not the extent to which ITT's scheme impacted its proposal evaluation. Absent from this discussion is any mention of the evaluation factors of Section M of the Solicitation. In conclusion, it appears that, in *Alion II*, the GAO has jettisoned both its legal and factual concerns from decisions past, a situation made even more disturbing on the realization that none of the operative facts from *Alion I* have changed.

In conclusion, it is evident that DISA ignored ITT's conflicts and neglected to reevaluate ITT's price and technical proposals because it was predisposed to award ITT the Contract in order to break free of Alion's so-called "stranglehold."

**B. Alion Will Suffer Irreparable Harm If ITT Is Allowed To Commence Performance Of The Awarded Contract**

A "lost opportunity to compete has been found sufficient to constitute irreparable harm." *Int'l Res. Recovery, Inc. v. United States*, 60 Fed. Cl. 1, 8 (2004) (citing *United Payors and United States Providers Health Servs., Inc. v. United States*, 55 Fed. Cl. 323, 333 (2005)); *see also United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998) ("the opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm.") (citing *Magnavox Electronic Sys. Co. v. United States*, 26 Cl. Ct. 1373, 1379 (1992)). *See also PGBA, LLC v. United States*, 57 Fed. Cl. 655, 664 (2003).

First, it is well-settled that Alion cannot recover lost profits from its bid protest action. *See Lion Raisins, Inc. v. United States*, 52 Fed. Cl. 115, at 119 (2002) (lost profits not available on implied-in-fact contract theory; remedy for recovery in bid protest actions is typically injunctive relief). Thus, Alion does not have an adequate remedy at law if it is successful in this bid protest. "This loss of profit, for which there is no adequate remedy at law, is accepted as a 'specific, irreparable injury' that warrants the entry of an injunction." *MVM, Inc. v. United States*, 46 Fed. Cl. 137, 142 (1999) (citing *Wetsel-Oviatt Lumber Co. v. Untied States*, 43 Fed. Cl. 748, 753 (1999)). As this Court has stated:

> Denial of the opportunity to obtain the present contract and the profits derived therefrom is precisely what plaintiff refers to when alleging its 'lost opportunity to compete'. This is an irreparable injury.

*Magnavox Elect. Sys. Co. v. United States*, 26 Cl. Ct. 1373, 1379 (1992).

Many opinions in the Court of Federal Claims have recognized that lost profits and lost opportunities to compete may constitute irreparable harm. *See J & H Reinforcing and Structural Erectors v. United States*, 50 Fed. Cl. 570, 577 (2001); *Overstreet Elec. Co. v. United States*, 47



AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC

Fed. Cl. 728, 744 (2000); *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000); *Stratos Mobile Networks USA, LLC v. United States*, 44 Fed. Cl. 633, 641 (1999); *TRW Envtl. Safety Sys., Inc. v. United States*, 18 Cl. Ct. 33, 78 (1989). This is precisely the harm that Alion will suffer if injunctive relief is not granted.

To begin with, Richard H. Meidenbauer, the Group Senior Vice President of Alion's Spectrum Engineering Group, has attested to the fact that Alion will be forced to [redacted]. Meidenbauer Affidavit, Ex. N. Laying off such a significant number of employees will cause [redacted] Alion's business and could potentially cause Alion to [redacted]. Further, Alion will be [redacted]. *Id.* ¶ 4.a. Alion will also [redacted]. Alion's [redacted]. *Id.* ¶ 4.b.

Further, Alion may be [redacted]. This [redacted]. *Id.* ¶ 4.c. Alion will also [redacted] Further, if ITT [redacted]

[redacted] *Id.*

Alion has no adequate remedy at law to seek redress of the unlawful actions of the United States. Because an at-law remedy is not available, the harm to Alion if ITT is allowed to continue performance is irreparable.

**C. The Harm To Alion Outweighs Any Potential Harm To The Defendant**

The third element of a preliminary injunction consideration requires that the Court "balance the potential harm to the plaintiff of not granting the injunction against the potential harm to both the Government and the awardee should the injunction be granted." *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 654 (2003).

The harm that Alion will suffer if this motion is not granted outweighs the harm to both the Government and the awardee if the injunction is granted. If the motion is denied, Alion will suffer significant, irreparable harm including the loss of key personnel and substantial revenue. Alion will also lose a vital business opportunity in the highly specialized electromagnetic spectrum engineering services field.

The Government will suffer no harm. Performance on the Contract is scheduled to continue until December 31, 2006. Modification No. P00210, Ex. A. Therefore, granting Plaintiff's motion will not in any way affect the satisfaction of the contract requirements.

Further, an injunction should be granted when doing so "will remove the taint of illegality from this procurement process without interfering with the Government's discretion to select its own contractors." *Parcel 49C Limited Partnership v. United States*, 31 F.3d 1147, 1154 (Fed. Cir. 1994). Such is the case here. It has been demonstrated that OCIs predominate in this



**AGREED UPON REDACTED COPY – MAY BE MADE PUBLIC**

Contract. Granting an injunction in favor of Alion will help ensure that the taint of the OCIs are removed from the Contract.

**D. Granting Injunctive Relief Is Strongly In The Public Interest**

The public interest is served by granting injunctive relief because the public has a strong interest in protecting the competitive process. *See Dairy Maid Dairy*, 837 F. Supp. 1370, 1382 (E.D. Va. 1993) ("The public interest is promoted by protecting the integrity of the Government procurement process."); *MVM, Inc. v. United States*, 46 Fed. Cl. 137, 143 (1999) ("Many cases have recognized that the public interest is served when there is integrity in the public procurement system."); *Minor Metals, Inc. v. United States*, 38 Fed. Cl. 16, 21 (1997). It has long been understood that the public interest is served by an injunction that is designed to ensure that the procurement process is conducted pursuant to law. It is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring Government officials to follow procurement statutes and regulations. *See Information Sciences Corp. v. U.S. and Gallagher, Hudson & Hunsberger, Inc.*, 2006 U.S. Claims LEXIS 274, *190 (Ct. Cl. 2006).

Further, while weighing the public interest in this particular case, the Court must consider potential harm to our nation's warfighters, especially in light of the ongoing and extensive military campaigns the United States is currently engaged in around the world. "The Tucker Act instructs the court to 'give due regard to the interests of national defense and national security' when considering bid protests.'" *Filtration Development Co., LLC v. United States*, 60 Fed. Cl. 371 (citing 28 U.S.C. § 1491(b)(3)). The Court has repeatedly taken such facts into consideration in the past. In *Avtel Servs. v. United States*, the Court found "compelling" arguments "that disruptions in contract performance will directly affect national security and defense needs…."

*Avtel Servs. v. United States*, 70 Fed. Cl. 173, 230 (2005). In *Sierra Military Health Care*, the Court stated that "the public interest in maintaining the morale of our military personnel … must be considered." *Sierra Military Health Care v. United States*, 58 Fed. Cl. 573, 585 (2003). And in *Aero Corp., S.A. v. United States*, the Court clarified that "the public interest balance tilts in defendant's favor due to the need for defendant to maintain military preparedness." *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 237, 242 (1997). Similar military considerations also informed the opinions of other cases. *See, e.g., Jade Trading, LLC v. United States*, 65 Fed. Cl. 487 (1999), *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 580 (2004). National security and defense needs are dependent on the warfighter, who navigates a battlefield that is becoming increasingly more spectrum-dependent. Alion seeks to enjoin the award of a contract that could expose the warfighter to greater risk than he or she already bears. It is evident, therefore, that granting Plaintiff's motion is strongly in the public interest.

## VI. CONCLUSION

Alion has established that it will likely succeed in demonstrating that DISA acted in an arbitrary and capricious manner in awarding the JSC Contract to ITT, that it will suffer irreparable harm if the Contract is awarded to ITT before a decision can be rendered in the merits of this case, that the balance of harms favors granting this motion, and that granting a preliminary injunction is in the public's interest. Therefore, the Court should grant Alion's Motion for Preliminary Injunction.

213305\3

Respectfully submitted,

Dated: September 29, 2006

J. Scott Hommer, III
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1685
Telecopier No.: (703) 821-8949
Protected Telecopier No.: (703) 760-1644

Of Counsel:

L. James D'Agostino
Richard L. Moorhouse
Greenberg Traurig, LLP
1750 Tysons Blvd., Suite 1200
McLean, Virginia 22102
Telephone No.: (703) 749-1300
Telecopier No.: (703) 749-1301

Peter A. Riesen
Keir X. Bancroft
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182
Telephone No.: (703) 760-1600
Telecopier No.: (703) 821-8949

**CERTIFICATE OF SERVICE**

This is to certify that, on the 29th day of September, 2006, I caused copies of the foregoing Plaintiff's Motion for Preliminary Injunction and Memorandum of Law in support thereof to be served by hand delivery on:

Jefferson Hughes
United States Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, DC 20530

Flayo O. Kirk. Esq.
Office of General Counsel
Defense Information Systems Agency
5111 Leesburg Pike, Suite 900, Skyline 5
Falls Church, VA 22041

Keir X. Bancroft

AGREED-UPON REDACTED COPY - MAY BE MADE PUBLIC

# Exhibits A – N

Privileged and confidential information; redacted in their entirety.